IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69537-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| CHAD BRUCE OLSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 7, 2014 |

SCHINDLER, J. — Chad Bruce Olson appeals his conviction of residential burglary in violation of RCW 9A.52.025. Olson claims his attorney provided ineffective assistance of counsel by failing to request a jury instruction on the defense of abandonment. Because abandonment is not a defense to the crime of residential burglary, we affirm.

FACTS

Jane Roberts and her husband lived together in the house they owned in Auburn at 38003 43rd Avenue South for nearly 37 years. Approximately six years after her husband died in "the late '80s," Roberts went to live near her sister in Puyallup. Roberts continued to own the Auburn house and for many years, Roberts hired a yard service to maintain the yard. Roberts kept many of her belongings at the house, as well as in a

workshop area inside the carport and in a freestanding, padlocked shed adjacent to the carport. Roberts also kept her black BMW convertible in the carport.

In 2011, Roberts' neighbors Karen Everett and Harvey McClung notified Roberts and called the police to report "kids had been breaking into the house" and a female and a male leaving the house. In late August or early September, McClung called 911 to report seeing a man and a woman drive away in Roberts' BMW.

King County Sheriff Deputy Denny Gulla testified that he responded to the reports of "people breaking into the house, taking property and a car from that house," and "tracked down the owner of the home." In September, Deputy Gulla began to routinely check on Robert's house at least once, if not twice, a day. Deputy Gulla testified, in pertinent part:

> I had been consistently checking the house to make sure it wasn't being continually burglarized or items being taken from the property.
>
> Q    Why were you doing that?
> A    Because the—the victim in this case did not live on that property, and she was elderly, and people were coming, removing her property without permission, and so we made an effort to—to check on the property and make sure that there wasn't any further loss of her property.

On October 11, Deputy Gulla walked around the entire property. Deputy Gulla testified the sliding glass door to the house was closed and locked, the doors to the workshop area were closed and locked, and the doors of the shed were "closed and padlocked."

At around 9:00 a.m. the following morning, next-door neighbor Karen Everett "saw a little silver pickup pulled—or, backed all the way into [Roberts'] roadway. And I

2

saw a gentleman there getting things out and putting things in his truck, and I said, okay, that doesn't look right." Everett called 911.

Shortly after her 911 call, neighbor Harvey McClung called 911 to report someone "unloading stuff out of a shed" and putting it "in a pickup truck [that was] full, from the best [he] could tell." McClung testified that the "backside of our property has a dog pen. And along that dog pen at the backside of the property there was four-foot high pieces of plywood. And you could see the top of a loaded pickup back there. And that's when I figured something's wrong."

Deputy Gulla arrived at the house approximately 10 minutes after the first 911 call. Deputy David Jeffries arrived shortly thereafter. Deputy Gulla and Deputy Jeffries saw a silver pickup truck backed up to the front of the storage shed and a tarp strung up to block the view from the street.

Deputy Gulla and Deputy Jeffries approached a man, later identified as Chad Bruce Olson, while he was "walking from the storage shed, carrying some items" to the pickup truck. The shed doors were open and there was property on the ground near the shed that had not been there the day before. Deputy Gulla said that "[t]here were a lot of things in the truck. The cab of the truck was filled full of various property, and the bed of the truck was nearly overflowing with property." Deputy Jefferies said there was a brass bedframe in the back of the truck. Deputy Gulla testified the brass bedframe had not been outside the day before.

Deputy Gulla testified that the rear sliding door to the house was "open about a foot, and there were some footprints on the inside of the entryway," and the "doorframe to the workshop area—the door had been forced open, and the frame was split and

3

broken." Inside the house, there were "fresh" footprints on the floor in "some type of sticky liquid." Deputy Gulla testified that the sole of the sneakers Olson wore matched the pattern of the footprints on the floor.

Olson said he told Deputy Gulla that he had permission from the owner to remove the property and showed the deputies a handwritten note. The note reads:

> <u>To Whom it may Concern</u>
>
> 9-30-11
>
> I Jane Roberts give full permission to Chad Olson & Tim Giseler to clean up my property and my things I no longer want, they have 3 weeks to clean up the whole property inside and out.
>
> 253-527-1129
>
> 38003 43rd Ave. S.
> Auburn, WA, 98001   signed 9-30-11
> [/s/] Jane A. Roberts

According to Deputy Gulla, Olson said that he "met [Roberts] at Dave's bar, which is in [the] Edgewood area, and she asked him to clean up her property, that she wrote him the note, and that she had moved to Mexico." Olson described Roberts "as about 67 years old . . . with blonde hair."

After Deputy Gulla contacted Roberts, he arrested Olson. Deputy Gulla said that while he was in the patrol car writing his report, Olson "looked over my shoulder and was reading the [computer] screen. And he . . . said, oh, she actually lives in Puyallup." Olson also said that "it wasn't a burglary because he never went in the house."

The State charged Olson with residential burglary. At the beginning of trial, the defense attorney stated Olson planned to request jury instructions on the lesser included crimes of burglary in the second degree and criminal trespass.

During the three-day jury trial, the State presented the testimony of Deputy Gulla, Deputy Jeffries, Deputy Neil Woodruff, Roberts, and her neighbors McClung and

4

Everett. The court admitted into evidence the sneakers Olson wore and photographs of the footprints found in the house.

Roberts testified she owns the Auburn house and she kept her belongings in the house and the locked shed. Roberts described going to her house on October 12 with Deputy Woodruff. Roberts said, "Everything was scattered around, and things broken and things missing," and she felt "[d]egraded[,] like my identity had been taken and part of my life gone." Roberts testified that the items in the pickup truck were taken from the shed and her house. Roberts said that she did not give Olson permission to go onto her property or go into the house or shed, or to take any property from the house or shed.

Deputy Woodruff testified when he took Roberts to her house on October 12, she was in "shock" and "had a hard time even standing. She needed me to help her stand. So, I braced her with my arm. She was almost throwing up. She was crying. She was distraught about what she had seen. It was pretty . . . moving for her." Deputy Woodruff said that Roberts told him "the brass bedframe had been in the house prior to her last visit."

Olson testified he owns a yard cleanup and recycling business called "Iron House Boys." Olson testified he has a business account with Tacoma Metals for recycling aluminum, copper, brass, nickel, titanium, platinum, and zinc. Olson said that he posted his business card and a flyer at Dave's Restaurant in Milton, Washington.

Olson said that he had permission to remove items from Roberts' property. Olson testified that on September 30, a woman and two other men approached him while he was at Dave's Restaurant and asked him if he was the owner of Iron House Boys. Olson said that "the woman asked me if I could do some yard cleanup for her."

Olson said that he asked the woman to write a note authorizing him to clean up the property and take "things I no longer want." Olson testified, in pertinent part:

> So, I said, well, is it local; is it far away? Because I—I need to know how far away it is from where I live so I could guesstimate. She said it's, uh, right over here by Five Mile Lake area. If you guys know where that is, it's in Federal Way. I said, well, yeah, what's the address. So, uhm, I wrote up this plan. I went out to my truck, got my binder, wrote up this—this, uh—this note here, and she gave me the address and she wrote down this phone number and she signed it.

Olson testified that he asked the woman if there were "any appliances or any metal products and she said, yes, it just needs to be cleaned up, and I said, okay, I'll do it." The court admitted into evidence a copy of the note Olson said that he gave to the officers before his arrest. Olson testified that the woman was "kind of heavyset[,] about 62 years old[,] well-dressed [with] dark hair, kind of curly." But Olson admitted the woman he talked to at Dave's Restaurant was not the Jane Roberts who testified in court.

Olson said that he did a "thorough inspection of the whole property" before starting in the shed "because the doors were open." Olson also testified that the sliding door of the house was open and he did not go into the house, but that he planned to go into the house because "I had permission."

On cross-examination, Olson admitted that he was convicted of forgery in 2004, theft in 2005, and trafficking in stolen property in 2006. Olson also admitted that in 2006, he did not have permission from the owner to remove and sell the metal siding of a mobile home.

In rebuttal, Deputy Joseph Eshom testified about the 2006 investigation of Olson for trafficking in stolen property. Deputy Eshom said that by the time he arrived at the

property owned by Melvin Couture, Olson had stripped most of the metal siding off Couture's mobile home and loaded the metal into his pickup truck. Deputy Eshom testified that Olson told him "the owner of the property gave him permission to clean the property up," and "the owner had given him permission to be on the property and to take the items." Deputy Eshom said Couture told him that he did not give Olson "permission to clean up or take anything off the property."

The court instructed the jury that to convict Olson of the crime of residential burglary, the State must prove beyond a reasonable doubt that he "entered or remained unlawfully in a dwelling" with the intent to commit a crime against "a person or property therein." The jury instructions defined "a dwelling" as "any building or structure which is used or ordinarily used by a person for lodging." The court also instructed the jury that "[a] person enters or remains unlawfully in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain."

At the request of the defense, the court also instructed the jury on the lesser included crimes of burglary in the second degree, criminal trespass in the first degree, and criminal trespass in the second degree, as well as the statutory defenses to criminal trespass in the first degree and criminal trespass in the second degree. Jury instruction 20 states:

> It is a defense to a charge of **Criminal Trespass in the First Degree** that:
>
> > A building involved in the trespass was abandoned, or the defendant reasonably believed that the owner of the premises or other person empowered to license access to the premises would have licensed the defendant to enter or remain.
>
> The State has the burden of proving beyond a reasonable doubt

7

that the trespass was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.[1]

Jury instruction 24 states:

It is a defense to a charge of **Criminal Trespass in the Second Degree** that:

The defendant reasonably believed that the owner of the premises or other person empowered to license access to the premises would have licensed the defendant to enter or remain.

The State has the burden of proving beyond a reasonable doubt that the trespass was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.[2]

During closing, the State argued the evidence established Olson committed the crime of residential burglary. The prosecutor pointed to the testimony that established the sliding glass door was locked the day before and the distinctive footprints Deputy Gulla found in the house that matched the shoes Olson wore. The prosecutor argued, in pertinent part:

And, in this case we have the evidence that Mr. Olson, in fact, entered into that house. We have the sliding door off the carport that was open when officers arrived and found him there. Deputy Gulla testified that he'd been there the morning before, and that sliding glass door was [not] open.

Inside the door on the ground you heard about the footprints, footprints that happened to match—well, not happened, but did match the shoes that were recovered from the Defendant's feet. He admitted to you that those were his shoes; that they were size 12 Filas, and Deputy Gulla pointed to you to the distinctive wavy pattern on the sole of the shoe, which you can see to a certain extent it's not a great photograph in the brown, sticky, liquid or dog feces as it may be where they were preserved. But . . . Deputy Gulla, himself, testified that seen in person it was even more clear that this was the footprint of the Defendant's shoes inside the residence.

---

[1] Emphasis in original.
[2] Emphasis in original.

8

The prosecutor also pointed to the testimony that the brass bedframe in the pickup truck had been in the house. The prosecutor argued, in pertinent part:

> We also know that he went into the residence because you've heard what the victim, Jane Roberts, said. At the time she came to the house that brass bedframe that was in the back of the truck was actually on the ground at that point. And, she pointed to that as Deputy . . . Woodruff told you, and said that bedframe was inside the house. Well, it's not inside the house anymore; it's out on the truck. And, logic tells you that the only way that it could have gotten there is if somebody went into the house and got it. Not someone; the only someone who was there was the Defendant, Chad Olson.

The prosecutor asserted Olson's testimony that he had permission to remove Roberts' belongings was not credible.

> The State would suggest to you that in that regard this question— this case really comes down to do you—do you believe Mr. Olson's story or not? If you believe his story, he had permission to be on the property, or at least thought he did, and he didn't have intent to commit a crime. He didn't have intent to steal because he thought he had permission—he had permission to take what it was he was taking. If you don't believe his story, then he's guilty because there is no permission for him to be there, and what he's doing is clearly stealing.

The defense argued that Olson believed he had permission from the owner to remove the property he loaded into his pickup truck. The defense claimed there was no evidence Olson ever entered the residence because Olson testified all the items in the truck except for the brass bedframe came from the shed, and there was no evidence that established when the bedframe was last in the house. The defense also argued that the State did not prove beyond a reasonable doubt that the shoeprints found in the house matched the soles of the shoes Olson wore.

As to the lesser included crimes of criminal trespass, defense counsel argued that not only did Olson have permission, but the house was abandoned. Defense counsel argued, in pertinent part:

> Criminal Trespass in the First Degree and Second Degree . . . was if the building was abandoned. That's a defense. If the Defendant reasonably believed that the owner would have given him permission to go onto the property, that's a defense. What isn't defined for you, which means you have to use your commonsense and perception, what does abandoned mean? Is it not abandoned because Mrs. Roberts still calls it home? Is that good enough? Or if we have independent evidence from other witnesses that no one has lived there since the early '80s or early '90s, that it's been ransacked multiple times . . . .
>
> Mrs. Roberts will never ever say she abandoned her house. And we know that. But it's our commonsense, our collective definition. And under that, it was abandoned. Det. Woodruff said abandoned. The house was disgusting; no water, it stunk of human waste. That's abandoned. Holes in the wall, furniture torn apart. I can't remember which one, but one of them said it looked like a house that someone had just walked away from. That means abandoned.

In rebuttal, the prosecutor asserted that while abandonment is a defense to criminal trespass, it is not a defense to residential burglary.

> [I]n this particular case, the question of whether this house is abandoned or not is a red herring, because if you look at the instructions, the jury instructions that you were given, what you will find is that the question of whether the house was abandoned is a defense to Criminal Trespassing. There's no instruction, because it's not in the case, that the question of whether it was abandoned is not a defense to Burglary.
>
> So, yes, you can find if you want to that this house is abandoned within the meaning [defense counsel]'s talking about and still find the Defendant—and you should still find the Defendant—guilty of Residential Burglary, because as the definition of dwelling told you, it's what is the building being used for? What is it ordinarily used for? Not what particular usage is it being put to at one particular point in time. This is a house; it's a dwelling. And the fact that it may or may not have been, quote, unquote, "abandoned," as you understand that word, isn't a defense to that charge.

The jury found Olson guilty of residential burglary. The court imposed a standard-range sentence of 75 months. Olson appeals.

10

ANALYSIS

Olson claims his attorney provided ineffective assistance of counsel by failing to request a jury instruction on abandonment of a building as a defense to the crime of residential burglary.[3] To establish ineffective assistance based on counsel's failure to request a jury instruction, the defendant must show that he was entitled to the instruction. State v. Cienfuegos, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001); State v. Johnston, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007). Whether abandonment is a defense to residential burglary is a question of law that we review de novo. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010).

The authority to define the elements of a crime "rests firmly with the legislature." State v. Torres Ramos, 149 Wn. App. 266, 271, 202 P.3d 383 (2009); State v. Evans, 154 Wn.2d 438, 447 n.2, 114 P.3d 627 (2005). Our goal in interpreting a statute is to carry out the legislature's intent. Gonzalez, 168 Wn.2d at 263. The court must give effect to the plain language of an unambiguous statute. See State v. Bunker, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010); Gonzalez, 168 Wn.2d at 263; State v. Jacobs, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005). If the plain language of the statute is unambiguous, this court's inquiry is at an end and we enforce the statute "in accordance with its plain meaning." State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

The legislature divided the crime of burglary into three felonies: (1) RCW 9A.52.020, burglary in the first degree, a class A felony; (2) RCW 9A.52.025, residential

---

[3] Based on the premise that abandonment is a defense to residential burglary, Olson also argues insufficient evidence supports his conviction.

burglary, a class B felony; and (3) RCW 9A.52.030, burglary in the second degree, a class B felony.

A person commits the crime of burglary in the first degree if the person, with the intent to commit a crime against a person or property, enters or remains unlawfully in a building, and while in the building or in flight therefrom, is armed with a deadly weapon or assaults a person. RCW 9A.52.020(1). A person is guilty of burglary in the second degree if he or she enters or remains unlawfully in a building "other than . . . a dwelling" with intent to commit a crime therein. RCW 9A.52.030(1).

A person is guilty of residential burglary if, "with intent to commit a crime against a person or property therein," he or she enters or remains unlawfully in a "dwelling." RCW 9A.52.025(1). A person "enters or remains unlawfully" when he or she is not licensed, invited, or otherwise privileged to enter or remain. RCW 9A.52.010(5).

Criminal trespass in the first degree is a lesser included offense of burglary in the second degree. State v. Soto, 45 Wn. App. 839, 840-41, 727 P.2d 999 (1986) (holding burglary in the second degree includes criminal trespass in the first degree). A person is guilty of criminal trespass in the first degree if he or she knowingly enters or remains unlawfully in a building. RCW 9A.52.070(1). Criminal trespass in the first degree is a gross misdemeanor. RCW 9A.52.070(2). Criminal trespass in the second degree is a lesser included crime of criminal trespass in the first degree. A person is guilty of criminal trespass in the second degree if he or she knowingly enters or remains "unlawfully in or upon premises of another under circumstances not constituting criminal trespass in the first degree." RCW 9A.52.080(1). Criminal trespass in the second degree is a misdemeanor. RCW 9A.52.080(2).

12

The legislature enacted statutory defenses for the crimes of criminal trespass in the first degree and criminal trespass in the second degree. RCW 9A.52.090. RCW 9A.52.090 provides, in pertinent part:

> **Criminal trespass—Defenses.** In any prosecution under RCW 9A.52.070 [(criminal trespass in the first degree)] and 9A.52.080 [(criminal trespass in the second degree)], it is a defense that:
> (1) A building involved in an offense under RCW 9A.52.070 was abandoned; or
> (2) The premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises; or
> (3) The actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him or her to enter or remain.[4]

In City of Bremerton v. Widell, 146 Wn.2d 561, 51 P.3d 733 (2002), our supreme court held that because the statutory defenses to criminal trespass negate the unlawful presence element of the crime of criminal trespass, the statutory defenses are not affirmative defenses. Widell, 146 Wn.2d at 570. The court also held that when the defendant asserts he had permission, the State must prove the absence of that defense. Widell, 146 Wn.2d at 570. In Widell, the court held, in pertinent part:

> Statutory defenses to criminal trespass negate the unlawful presence element of criminal trespass and are therefore not affirmative defenses.
> . . . Further, the burden is on the State to prove the absence of the defense when a defendant asserts his or her entry was permissible under RCW 9A.52.090(2) because that defense "negates the requirement for criminal trespass that the entry be unlawful." State v. Finley, 97 Wn. App. 129, 138, 982 P.2d 681 (1999). Thus, once a defendant has offered some evidence that his or her entry was permissible under RCW 9A.52.090, the State bears the burden to prove beyond a reasonable doubt that the defendant lacked license to enter.

Widell, 146 Wn.2d at 570.

---

4 Emphasis in original.

13

Olson relies on the Division Three decision in State v. J.P., 130 Wn. App. 887, 125 P.3d 215 (2005), to argue that abandonment is a defense to residential burglary. In J.P., J.P. was apprehended after he crawled out the window of a vacant home being prepared for sale. The juvenile court found J.P. guilty of residential burglary. J.P., 130 Wn. App. at 890-91. On appeal, J.P. argued that the statutory defense of abandonment was a defense to residential burglary. J.P., 130 Wn. App. at 894. Relying on Widell, the court held that J.P. could assert abandonment as a defense to residential burglary. J.P., 130 Wn. App. at 895. The court concluded that because residential burglary required proof of unlawful entry or presence, the defense of abandonment could negate the unlawful entry or presence element of the crime. J.P., 130 Wn. App. at 895. Nonetheless, because sufficient evidence supported the conclusion that the vacant house was not abandoned, the court affirmed. J.P., 130 Wn. App. at 896.

In State v. Jensen, 149 Wn. App. 393, 203 P.3d 393 (2009), Division Two disagreed with the analysis and conclusion in J.P. that abandonment is a defense to the crime of residential burglary. Jensen, 149 Wn. App. at 400-01. In Jensen, a jury found Jensen guilty of burglary in the second degree. Jensen, 149 Wn. App. at 397. On appeal, Jensen argued he was entitled to a jury instruction on abandonment as a defense to the crime of burglary in the second degree. Jensen, 149 Wn. App. at 397-98. The court held that under the plain and unambiguous language of the statute, the defense of abandonment applies "only to prosecutions for first degree criminal trespass" and abandonment is not a defense to burglary in the second degree. Jensen, 149 Wn. App. at 400-01.

> As with any other statute, where the language of a statutory defense is clear, its plain language is to be applied as written. . . . Applying the

statute as written, we hold that RCW 9A.52.090(1)'s abandonment defense is not available regarding Jensen's charged offense of second degree burglary.

Jensen, 149 Wn. App. at 401. The court expressly rejected the reliance of the court in

J.P. on Widell:

> Widell held only that when a defendant sufficiently asserts one of the statutory defenses to criminal trespass, the burden to disprove the defense falls on the State. . . . Nothing in Widell suggests that expansion of those statutory defenses to other crimes is warranted.

Jensen, 149 Wn. App. at 401.

We agree with the analysis in Jensen. Under the plain and unambiguous language of the statute, the defense of abandonment applies only to the crime of criminal trespass. The legislature did not provide the statutory defense of abandonment as a defense to residential burglary, and the supreme court in Widell did not hold otherwise. See State v. Frampton, 95 Wn.2d 469, 477-78, 627 P.2d 922 (1981) (presumption that legislature was aware of the state of the law); Chandler v. Otto, 103 Wn.2d 268, 274, 693 P.2d 71 (1984) (stating courts presume legislature is aware of its prior enactments).

The legislature enacted the new offense of residential burglary in 1989. LAWS OF 1989, ch. 412, § 1. Legislative history shows that consistent with the common law, the crime of residential burglary was enacted in order to punish burglaries occurring in dwellings more harshly "[i]n light of the steady increase in residential burglaries and the potential for personal injury inherent in such crimes." FINAL B. REP. on S.B. 5233, 51st Leg., Reg. Sess. (Wash. 1989).

Under the common law, "[b]urglary has always been regarded as a serious crime because of the ancient notion that a man's home is his castle. When he closes his door, he should be able to feel secure in his castle." 3 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 325, at 253 (15th ed. 1995). See also RCW 9A.04.060 (common law supplements criminal statutes to the extent not inconsistent); State v. Byrd, 125 Wn.2d 707, 712-13, 887 P.2d 396 (1995) (examining common law to construe undefined term in criminal statute); State v. Wentz, 149 Wn.2d 342, 356, 68 P.3d 282 (2003) (Madsen, J., concurring) (common law burglary considered a " 'heinous offense' " because it invaded the " 'right of habitation' ") (quoting 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 8.13(c) at 469 (1986 & Supp. 2003))).[5]

In addition, the record establishes a strategic reason not to request an instruction on abandonment as a defense to residential burglary. In order to prevail on a claim of ineffective assistance of counsel, Olson must demonstrate (1) deficient performance, that his attorney's representation fell below the standard of reasonableness; and (2) resulting prejudice, that but for the deficient performance, the result would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Bowerman, 115 Wn.2d 794, 808, 802 P.2d 116 (1990) (adopting the standards in Strickland). If a defendant fails to establish either prong, we need not inquire further. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

---

[5] The out-of-state case Olson relies on, McKenzie v. State, 407 Md. 120, 962 A.2d 998 (2008), is distinguishable. In McKenzie, the Maryland Court of Appeals held that an unoccupied apartment that is suitable for occupancy is a "dwelling" for purposes of the burglary statute. McKenzie, 407 Md. at 134-35. Here, unlike in McKenzie, Olson did not argue that Roberts' house is not a dwelling. See McKenzie, 407 Md. at 123.

There is a strong presumption of effective representation of counsel, and the defendant has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995). As the Supreme Court explained in Strickland:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134[, 102 S. Ct. 1558, 71 L. Ed. 2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)].

Strickland, 466 U.S. at 689.

Here, Olson told the deputies he had permission from the owner to remove the property he had loaded into his pickup truck. Olson then gave the deputies a note from "Jane A. Roberts" dated September 30, 2011 authorizing him to clean up and remove "my things I no longer want." Olson also told Deputy Gulla that he did not commit residential burglary because he never entered the house. At trial, Olson continued to insist that he had permission to remove property. Olson also testified that he did not enter the house on October 12, but was "going to . . . [b]ecause I had permission." Because the record

17

establishes a clear, strategic reason to not request an abandonment instruction as a defense to residential burglary, Olson's claim of ineffective assistance of counsel fails.[6]

We affirm.

WE CONCUR:

---

[6] We also note Roberts' testimony established the house was not abandoned.