IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHNGTON, | ) | No. 78092-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RALPH ARTIAGA, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 22, 2019 |

SCHINDLER, J. — Ralph Artiaga appeals his jury conviction for residential burglary. Artiaga contends ineffective assistance of counsel deprived him of his Sixth Amendment right to a fair trial. In a supplemental brief, Artiaga asks the court to remand to strike the $100 DNA[1] fee. We affirm the conviction but remand to strike the DNA fee.

FACTS

Kelsea Pullin works for Microsoft and lives in an apartment in Kirkland. In January 2016, Pullin and Ralph Artiaga began dating. Pullin and Artiaga spent "almost every day of the week" together. Pullin and Artiaga kept "separate apartments" but they would "stay at each other's places."

---

[1] Deoxyribonucleic acid.

Pullin had two copies of the key to her apartment. Artiaga often spent the night at Pullin's apartment and at "certain times he'd have a — the second key." Artiaga had access to Pullin's apartment "when [she] would be at work."

The relationship became "toxic" and Pullin and Artiaga "broke up in May." Pullin told Artiaga to "get out, take your stuff," and "blocked him on all outlets." Pullin took her key back and "didn't talk to him for an extended period of time."

Pullin and Artiaga reconnected at the "[e]nd of June." Pullin and Artiaga were "taking it slow." But soon Artiaga began "staying at [her] apartment again" almost every night. Pullin gave Artiaga a key to her apartment.

After an argument in July, Artiaga bought Pullin a puppy because Pullin told Artiaga that she "always wanted a puppy." Artiaga said it was a "birthday gift." Pullin was concerned that Artiaga would use the puppy as "manipulation" to stay together. Pullin made it "very clear, like you bought her for me. I'm going to name her. I'm going to put everything in my name. Like this is my dog." Pullin made sure the puppy was vaccinated and obtained pet insurance.

Pullin testified that in August, they got into "another argument." Pullin told Artiaga to leave and "made that very clear" that she "wanted the key back." Artiaga refused to return the key.

Pullin went on a vacation in August. Pullin asked her brother to watch the puppy while she was gone.

Pullin returned from vacation late at night on August 29. When she woke up the next morning, Pullin called Artiaga to "ask for [her] key back." Artiaga got upset.

2

Artiaga "raised his voice" and "said, no, I'm not bringing the key back." Artiaga told Pullin, "You can come get it yourself. . . . [Y]ou should just get your locks changed."

At around 9:00 or 10:00 p.m. on August 30, Pullin went out to "the Lodge" in Kirkland with a male friend. Sometime after midnight, they went back to her apartment.

Artiaga called Pullin and said he was "on his way over." Pullin said "[N]o, you're not. . . . You're not welcome." Artiaga said, "[O]h, yes I am, watch me," and "hung up the phone."

At 1:00 or 1:30 a.m., as Pullin's male friend opened the door to leave her apartment, Artiaga "barge[d]" in. Artiaga went into the kitchen, "grab[bed] a butcher knife," and "started waving it around." Artiaga called Pullin a "fucking slut" and told her friend to "get the fuck out." Artiaga "went into the living room" and "grabbed" the puppy. As he "zoomed out the front door," Artiaga said, "You're never getting your dog back."

Pullin called 911. Kirkland Police Officer Michael Lisenby pulled into the apartment complex in a "fully-marked police SUV"[2] and saw a "newer black passenger car out in front of the apartment complex that was kinda slowly rolling." Officer Lisenby saw "a female running towards the car, . . . she was screaming." The woman "[p]ointed . . . to the car" and said, "That's him, that's him."

Officer Lisenby started to get out of the police car "to get him to stop." Officer Lisenby wore his full police uniform. As the car was "continuing toward my vehicle," Officer Lisenby yelled, "[S]top, police." The driver, later identified as Ralph Artiaga, did not stop. Artiaga "hit the accelerator and drove off at high speed," heading "southbound onto the main thoroughfare of 124th Avenue." Officer Lisenby "got back in my car to go off after him."

---

[2] Sport-utility vehicle.

3

Artiaga "made a turn onto . . . 112th Place." The car pulled over "on the side of the road" and Artiaga got out of the car and "started running southbound." Officer Lisenby ran after him and yelled, "Stop, police." Artiaga did not stop. Officer Lisenby caught up with Artiaga and tried "to take him into custody." Officer Lisenby grabbed Artiaga and they "ended up going to the ground." Corporal Cody Mann arrived and helped Officer Lisenby detain Artiaga. Officer Lisenby arrested Artiaga. The officers found the puppy in the car.

Officer Lisenby read Artiaga his Miranda[3] rights. Artiaga waived his Miranda rights and agreed to talk. Corporal Mann returned the puppy to Pullin.

The State charged Artiaga with residential burglary domestic violence and attempting to elude a pursuing police vehicle. The State also charged Artiaga with assault in the second degree domestic violence. The State later dismissed the assault charge.

Pullin, her neighbor Rebecca Johnson, Officer Lisenby, and Corporal Mann testified at trial. Pullin testified that after the fight in August, she never asked Artiaga "to come over" and "take care of the dog" and did not ask him to "watch the dog during [her] trip." Pullin testified that in July, Artiaga told her that the puppy is "mine, I bought her. I paid for her." Pullin told Artiaga, "[N]o, you gave her to me as a gift."

Pullin testified that when she was on vacation, she wanted to "end, solidly, what was going on with him." Pullin said that Artiaga "wasn't sort of on the same page" and continued to send text messages, "saying things like I miss you, I can't wait for you to come home." Pullin testified that Artiaga went to her apartment while she was on vacation to "get his stuff."

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

Pullin testified that when she asked for the key back after she returned from vacation, she told Artiaga she "needed the key because my friend Erin was going to be watching [the puppy] that week or night, whatever it was, so my friend needed access to pick up" the puppy.

On cross-examination, Pullin testified that she had to "clarify . . . with him over and over again" that the dog was hers. Pullin said they had the "same conversation . . . [m]ultiple times" and it was a "constant issue." Pullin said she repeatedly told Artiaga that "he has no ownership if he's giving this dog to me as a gift." Pullin had to "clarify with him time and time again" because it was "[u]nclear to him."

On redirect, Pullin testified that Artiaga "signal[led] that he understood" their conversations about the dog. Pullin said Artiaga sent a text message saying, "[S]he's yours." Pullin testified, "[F]or the most part I felt like he understood."

Rebecca Johnson testified that she lived in the same apartment complex as Pullin. Johnson said that "in the early morning hours of August 30th," she heard "a blood curdling sort of scream really, really loud outside my window." Johnson testified that she called 911.

Officer Lisenby and Corporal Mann testified about the statements Artiaga made after waiving his Miranda rights. Artiaga told Officer Lisenby:

> [Artiaga] and his on-and-off girlfriend were separated, but he — she had been wanting the key back that he still had. He wanted to get his dog, . . . which was at the apartment, and he said he figured that she wasn't there, so he was going to go there to get the dog while hopefully she was gone.

Artiaga told Officer Lisenby that "when he got there, . . . he used the key to . . . open the door, and as he was doing that, another male that was there op— continued to open the door." Artiaga "thought they were going to possibly fight, but they didn't." Artiaga told

5

Officer Lisenby that "he wanted the dog and that he ended up taking the dog and left." Artiaga told Officer Lisenby that "there was no knife involved." Corporal Mann testified that Artiaga said he "believed that he was still in a dating relationship with Ms. Pullin" and was "surprised to see another man there."

Kendrick Tipler testified for the defense. Tipler testified that he worked in a sports bar called "the Dub Pub" next door to Pullin's apartment. Tipler said that he and Artiaga became friends. Tipler testified that Artiaga lived in the apartment "with his girlfriend." Tipler said he "hung out" with Artiaga "four or five nights a week" at either "my house, or his house." Tipler testified that he "remember[ed] the day when he got the dog." Tipler testified Artiaga would sometimes "bring the dog with him" to the pub.

Because the State was "proceeding with the theft of the dog" as the underlying crime, defense counsel proposed a residential burglary instruction that strikes the language "against a person" and states only "to commit a crime against property therein." Defense counsel proposed giving instructions on "the theft definition as well as the affirmative defense of theft." Defense counsel requested a lesser included offense instruction for attempting to elude a pursuing police vehicle of failure to obey an officer's commands.

The court agreed to give the defense instruction on residential burglary, instructions on theft and the defense of good faith claim of title, and the instruction on the lesser included offense of failure to obey.

In closing argument, the prosecutor argued the State proved beyond a reasonable doubt that Artiaga unlawfully entered and remained in Pullin's apartment "with the intent to commit a crime against property" and commit theft of the puppy. The

6

prosecutor argued that burglary can be "done by someone who was once welcome in your home but is no longer welcome." The prosecutor argued Pullin could "withdraw her consent" and "that is precisely what she did." The prosecutor argued Pullin "kicked him out" and "tried to get that key back" in August.

The prosecutor argued Artiaga "did not have a good-faith claim of title" to the puppy.

> So the big question is the dog. Is there an intent to commit a crime inside the apartment? We heard a lot of testimony about the dog. It's very clear that everybody involved cares a lot about that dog. She's a very cute little dog. But the question is whether or not the defendant had a good-faith claim on the dog, and the answer is no.

The prosecutor argued Artiaga "brought the dog home to [Pullin]" and it "was an early birthday present." The prosecutor argued Pullin "had a conversation with the defendant the next day" and said, "[T]his is going to be my dog. It's not our dog. It's my dog. I'm paying for it. I'm naming the dog, getting insurance, all of that." The prosecutor argued, "And this was reiterated on multiple occasions, clear as a bell."

The prosecutor argued that "after she kicked him out on August 9th and 10th," Artiaga "wasn't taking care of the dog. Kelsea was having her friends help her." The prosecutor argued, "The defendant did not have possession of that dog. And Kelsea had made it clear the dog belonged to her."

Defense counsel argued, "[T]he fact that Ralph believed he was allowed to be in her apartment and that he went there with the key, and the fact that he clearly believed this to be his dog, even if Ms. Pullin disagrees, these show that the State has failed to meet its burden of proof on the charge of residential burglary."

Defense counsel argued the evidence "shows that Ralph believed he could just go there, that he could be there." Defense counsel argued that in August, "they didn't entirely break up" and Artiaga "still had a key to her apartment." Defense counsel argued Pullin knew that Artiaga went to her apartment while she was on vacation and he "would communicate with her in the same way, saying that he missed her, that he can't wait for her to come back. And she never said anything to lead him to believe anything different." Defense counsel argued that how Pullin "was feeling during that time" was "not relevant" because Artiaga "didn't know any of that. He didn't know that she wanted to break up with him."

Defense counsel argued that Artiaga went to Pullin's apartment "to take something that he believed was his, his dog Olivia, a dog that he bought, a dog that he cared for, and that he took care of day in and day out." Defense counsel argued that the State "must prove that he entered and remained unlawfully in a dwelling, and the State also has to prove that he did so with the intent to commit a crime against property there, to commit a theft" of the dog. Defense counsel emphasized the evidence showed Artiaga had a good faith claim of title to the puppy:

> Now, we've heard the definition of theft, and then we've heard that there is a defense of theft, which is good-faith claim of title. And you can read about this definition in your jury instructions, but what it says is that it is a defense to theft if a person openly and avowedly by a good-faith claim of title, even if the claim is untenable. So this is about what Ralph believed was his, what he put forward to being his, and the State has to prove beyond a reasonable doubt that that's not the case.

Defense counsel argued it is "clear that both Ms. Pullin and Mr. Artiaga really loved their dog. . . . You heard that he took care of the dog. You heard that he bought

the dog." Defense counsel argued that Artiaga "believed this to be his dog." Defense counsel said:

> She's saying it's my dog, and he's saying, you know, I don't agree with you. And this keeps coming up, argument after argument, she said at least five times in those two months. If he was agreeing with her, there would be no need to have these ongoing conversations.

Defense counsel argued Artiaga believed that "he had claim of title to the dog, . . . he believed it was his."

The jury found Artiaga guilty of residential burglary. The jury found Artiaga not guilty of attempting to elude a pursuing police vehicle. The jury convicted Artiaga of the lesser included crime of failure to obey. By special verdict, the jury found that Artiaga and Pullin were not "members of the same family or household prior to or at the time the crime was committed."

ANALYSIS

Ineffective Assistance of Counsel

Artiaga contends his attorney provided ineffective assistance of counsel by (1) not requesting a jury instruction on the lesser included offense of criminal trespass in the first degree for the charge of residential burglary and by (2) proposing an inaccurate instruction on good faith claim of title.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We review claims of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

9

To establish a claim of ineffective assistance of counsel, Artiaga must show (1) deficient performance that fell below an objective standard of reasonableness and (2) but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. Strickland, 466 U.S. at 687. If either prong of the test is not satisfied, our inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

A defendant alleging ineffective assistance of counsel must overcome " 'a strong presumption that counsel's performance was reasonable.' " Grier, 171 Wn.2d at 33 (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Counsel's performance is not deficient where it can be " 'characterized as legitimate trial strategy or tactics.' " Grier, 171 Wn.2d at 33 (quoting Kyllo, 166 Wn.2d at 863). A defendant "can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.' " Grier, 171 Wn.2d at 33 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

> "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

Grier, 171 Wn.2d at 34 (quoting Strickland, 466 U.S. at 689).

<u>(1) Lesser Included Instruction on Criminal Trespass</u>

Artiaga contends there is no strategy or tactical reason for not requesting the lesser included jury instruction on criminal trespass. Failure to request a lesser-included-offense instruction is not deficient performance if the decision is part of an "all or nothing" approach. Grier, 171 Wn.2d at 39. That a strategy is "ultimately proved

unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis." Grier, 171 Wn.2d at 43.

To prove residential burglary, the State must prove beyond a reasonable doubt that (1) Artiaga unlawfully entered or remained in a dwelling (2) with the intent to commit a crime against property therein. RCW 9A.52.025(1). Criminal trespass in the first degree is a lesser included offense of burglary in the second degree. State v. Olson, 182 Wn. App. 362, 375, 329 P.3d 121 (2014). A person is guilty of criminal trespass in the first degree if "he or she knowingly enters or remains unlawfully in a building." RCW 9A.52.070(1).

Artiaga contends and the State does not dispute that had his attorney proposed the lesser included instruction on criminal trespass, the court would have granted the request under State v. Workman, 90 Wn.2d 443, 584 P.2d 382 (1978). But the record shows defense counsel was aware that he could request a lesser included instruction on criminal trespass and the decision not to request the instruction was strategic.

At trial, Artiaga argued that he did not unlawfully enter Pullin's apartment because they were not broken up, he had a key, he believed he still had access to the apartment, and he did not intend to commit a crime against property because he had a good faith claim of title to the puppy.

Pullin testified that she had not "officially" broken up with Artiaga and they were not "on the same page" about the relationship. Pullin testified that Artiaga did not return her key. Pullin testified they had multiple conversations about who owned the dog because it was "[u]nclear" to Artiaga. Artiaga told Corporal Mann he "believed that he was still in a dating relationship with Ms. Pullin." Artiaga told Officer Lisenby he

11

believed the puppy belonged to him and he went to Pullin's apartment "to get the dog while hopefully she was gone."

Had defense counsel requested an instruction on the lesser included offense of criminal trespass, he would have had to argue that Artiaga unlawfully entered or remained in Pullin's home. This argument was contrary to Artiaga's statements to the police officers and the defense theory at trial that Artiaga believed he had permission to be in the apartment and was there to retrieve the puppy that belonged to him.

Because the decision not to request a lesser included instruction on criminal trespass was a strategic decision, we conclude Artiaga has not carried his burden to establish deficient performance and his claim of ineffective assistance of counsel fails.

(2) Good Faith Claim of Title Defense

Artiaga contends his attorney provided ineffective assistance of counsel by proposing a deficient jury instruction on good faith claim of title and the instruction as written relieved the State of its burden of proof.

The State charged Artiaga with residential burglary, alleging he entered and remained unlawfully in the dwelling of Pullin with intent to commit a crime against a person or property therein. In State v. Bergeron, 105 Wn.2d 1, 16, 711 P.2d 1000 (1985),[4] the Washington Supreme Court held that "the specific crime or crimes intended to be committed inside burglarized premises is not an element of burglary that must be included in the information, jury instructions or in the trial court's findings and conclusions."

In any event, the State's theory at trial was that Artiaga entered and remained unlawfully in Pullin's apartment only with the intent to steal the puppy. At the request of

---

[4] Emphasis in original.

the defense, the court gave a to-convict instruction on residential burglary that stated the jury must find beyond a reasonable doubt that the entering or remaining was with intent only "to commit a crime against property therein." Defense counsel also proposed instructions that included the definition of theft and the good faith claim of title defense to theft. The court agreed Artiaga is "entitled to all theft . . . instructions and the affirmative defense."

Good faith claim of title is a statutory defense to theft. RCW 9A.56.020(2)(a). RCW 9A.56.020(2)(a) states:

> In any prosecution for theft, it shall be a sufficient defense that:
> (a) The property or service was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable.

"This defense negates the element of intent to steal by providing that a defendant cannot be guilty of theft if the defendant takes property from another 'under the good faith belief that he is the owner, or entitled to the possession, of the property.' " State v. Ager, 128 Wn.2d 85, 92, 904 P.2d 715 (1995) (quoting State v. Hicks, 102 Wn.2d 182, 184, 683 P.2d 186 (1984)).

The jury instructions accurately stated the law. The jury instructions define "theft" as "to wrongfully obtain or exert unauthorized control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services." The jury instruction on the good faith claim of title states:

> It is a defense to a charge of theft that the property or service was appropriated openly and avowedly under a good faith claim of title, even if the claim is untenable.
> The State has the burden of proving beyond a reasonable doubt that the defendant did not appropriate the property openly and avowedly under a good faith claim of title. If you find that the State has not proved

13

the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

Artiaga cites State v. Brown, 36 Wn. App. 549, 676 P.2d 525 (1984), to argue his attorney provided ineffective assistance of counsel by not proposing an instruction "stating that 'good faith claim of title' is a defense to a charge of burglary."[5] Brown does not support Artiaga's argument that he was entitled to an instruction that states good faith claim of title "is a defense to burglary."

In Brown, the State charged the defendants with burglary in the first degree where the "underlying crimes alleged were theft and assault." Brown, 36 Wn. App. at 552. The defendants moved to instruct the jury on "the good faith claim of title defense to theft." Brown, 36 Wn. App. at 558-59. The trial court refused to give the instruction. Brown, 36 Wn. App. at 558-59. On appeal, we affirmed because the record was "devoid of evidence to support an instruction on the good faith claim of title defense." Brown, 36 Wn. App. at 559. The court held, "The good faith claim of title defense to theft applies only when a claim of title can be made to the specific property acquired." Brown, 36 Wn. App. at 559.

Artiaga also cannot show prejudice. The record shows that during closing argument, both the prosecutor and defense counsel reiterated that if the jury found Artiaga had a good faith claim of title to the puppy, then he did not have the intent to commit a crime against property and must be acquitted of residential burglary.

Artiaga also contends that because the "instructions did not correctly state the law," the State was relieved of its burden of proof. The jury instruction on good faith claim of title states, "The State has the burden of proving beyond a reasonable doubt

---

[5] Emphasis omitted; boldface omitted.

that the defendant did not appropriate the property openly and avowedly under a good faith claim of title." Because the instruction accurately stated the law and the State was required to prove every element of the crime beyond a reasonable doubt, we conclude the State was not relieved of its burden of proof.

DNA Fee

Artiaga contends and the State concedes that the panel should remand to strike imposition of the $100 DNA fee because the State previously collected Artiaga's DNA due to a prior conviction. A legislative amendment effective June 7, 2018 eliminated the mandatory $100 DNA collection fee where "the state has previously collected the offender's DNA as a result of a prior conviction." RCW 43.43.7541; LAWS OF 2018, ch. 269, § 18. This amendment applies prospectively to Artiaga due to his pending direct appeal at the time of the amendment's enactment. State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). Accordingly, we remand to strike the $100 DNA fee from the judgment and sentence.

We affirm.

WE CONCUR: