[Nos. 42396-1-II; 43021-5-II.   Division Two.   December 17, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS LEE FLOYD, *Appellant*.

*Stephanie C. Cunningham*, for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Kimberley A. DeMarco* and *Melody M. Crick, Deputies*, for respondent.

¶1  BJORGEN, J. — Thomas Floyd appeals from his convictions for second degree assault and six violations of a no-contact order, as well as the sentencing court's use of his 1972 convictions for robbery and second degree assault in calculating his offender score. The State cross appeals the sentencing court's determination that Floyd does not qualify as a persistent offender subject to a mandatory life sentence under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570. The State also appeals from a different sentencing court's offender score calculation, resulting from Floyd's subsequent conviction for stalking and violation of a no-contact order based on conduct involving the same victim.

¶2  Floyd, aided by standby counsel, represented himself in a jury trial in the first proceeding after the State charged him with assault and violating a no-contact order under cause number 10-1-00019-6. Shortly after Floyd began his closing argument, the trial court terminated his pro se status and directed standby counsel to complete the argument. The jury found Floyd guilty of all charges. The State had asked that Floyd be sentenced to a life term as a persistent offender based on the two 1972 convictions, but the sentencing court ultimately refused, finding the robbery[1] conviction unconstitutional on its face and the assault conviction not comparable to a "most serious offense" under RCW 9.94A.030(32). Verbatim Report of Proceedings (VRP) (Dec. 2, 2011) at 106. The sentencing court nonetheless used both prior convictions in calculating Floyd's offender score, sentencing him to the maximum standard-range term of confinement.

¶3  The State subsequently charged Floyd under cause number 11-1-02808-1 with stalking and an additional count of violating a no-contact order involving the same victim. Floyd again represented himself, and a jury returned guilty

---

[1] In 1972, the robbery statute did not define varying degrees of the crime. Former RCW 9.75.010 (1909), *repealed by* LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.92.010.

verdicts on both counts. The sentencing court agreed with the prior sentencing court's determinations concerning the 1972 convictions but independently calculated Floyd's offender score, again sentencing him to the maximum standard-range term.

¶4 Floyd argues that (1) the first trial court violated his right to defend in person by terminating his pro se status, (2) insufficient evidence supports his convictions for violating a no-contact order at the first trial, and (3) the first sentencing court erroneously included his 1972 convictions for robbery and assault in his offender score. The State argues that (1) the first sentencing court erred by refusing to count the two 1972 convictions as "strikes" for purposes of the POAA and (2) the second sentencing court erred by refusing to include the 1972 convictions in calculating Floyd's offender score.

¶5 In this consolidated appeal, we affirm each of Floyd's challenged convictions, as well as the sentence imposed after Floyd's second trial. We vacate the sentence imposed after the first trial, however, and remand for resentencing in accordance with this opinion.

## FACTS

### I. FLOYD'S FIRST TRIAL

¶6 Floyd and his wife, Annette Bertan,[2] had an altercation on the night of January 3, 2010 at their Lakewood condominium. Their downstairs neighbor called 911 after Bertan came to his door bleeding from a wound near her left ear. Responding officers encountered Floyd in the parking lot, noticed blood on his hands, and arrested him.

¶7 On January 4, 2010, the trial court entered an order in open court prohibiting Floyd from contacting Bertan.

---

[2] Bertan obtained a divorce after the events giving rise to the assault charge but prior to Floyd's trial.

Over the next few months, Floyd nonetheless attempted to call Bertan several times from the Pierce County jail and Western State Hospital.[3] The State ultimately charged Floyd by amended information with one count of second degree assault involving domestic violence and six counts of violating a no-contact order.

¶8 The State filed a notice that it intended to seek a mandatory life sentence under the persistent offender statute, based on Floyd's 1972 convictions for robbery and assault. The trial court allowed Floyd to represent himself, finding Floyd's request explicit, knowing, and voluntary, but appointed standby counsel over Floyd's objection.

¶9 At trial, Floyd's limited knowledge of court procedures and rules of evidence, as well as his apparent confusion and frustration when the trial court sustained most of the State's objections, led to many disruptions and repeated admonitions by the court. The trial court also spent considerable time hearing motions brought by Floyd that it ultimately found duplicative or meritless. However, Floyd rarely interrupted the presentation of the State's evidence, addressed the court respectfully, generally accepted the court's rulings on his objections without protest, and appeared to make a genuine effort to follow the court's instructions.

¶10 During closing argument, Floyd referred to several facts not in evidence, drawing repeated objections from the State. VRP (Apr. 5-6, 2011) at 733-34, 736, 738. After the court admonished Floyd again to argue only from evidence properly before the jury, Floyd asked questions that demonstrated some confusion as to what the court meant. VRP (Apr. 5-6, 2011) at 739. Floyd also attempted to offer additional evidence through his statements during closing. VRP (Apr. 5-6, 2011) at 743.

¶11 At that point the court excused the jury and, after expressing the opinion that Floyd had intentionally acted to

---

[3] Floyd underwent multiple court-ordered competency and other medical evaluations at Western State Hospital after various pretrial proceedings.

"scuttle" the trial, engaged in a colloquy with Floyd and heard argument from the State and Floyd's standby counsel. VRP (Apr. 5-6, 2011) at 740. Then, over objections from both Floyd and the State, the court terminated Floyd's pro se status and appointed standby counsel to complete closing argument. Standby counsel argued that the jury could convict Floyd only of third degree assault because Bertan did not suffer substantial bodily harm. The jury returned guilty verdicts on all counts.

¶12 At sentencing, the court concluded that the State could not rely on either of Floyd's 1972 convictions as "strikes" for purposes of the POAA. VRP (July 15, 2011) at 106. The court ruled the robbery conviction invalid on its face because the information and two of the jury instructions misstated the elements of the crime, and it found the assault conviction not comparable to a "most serious offense" under current law because of differences in the mens rea and degree-of-injury elements. VRP (July 15, 2011) at 106. The court then concluded that both 1972 convictions counted toward Floyd's offender score, making it four. The court ultimately sentenced Floyd to 20 months' confinement on the assault charge and to a 3-year suspended sentence for the remaining counts.

## II. FLOYD'S SECOND TRIAL

¶13 The State subsequently charged Floyd with violation of a domestic violence court order and stalking, based on his further attempts to contact Bertan. Floyd again represented himself, aided by the same standby counsel assigned by the previous trial court, and the jury returned guilty verdicts on both charges. The sentencing court sua sponte raised a question as to whether collateral estoppel required it to accept the prior sentencing court's determinations concerning Floyd's criminal history. Ultimately, the court accepted the argument made by Floyd's standby counsel that it should agree with the prior sentencing

court's conclusions as to Floyd's 1972 convictions, but not the prior offender score calculation. The court sentenced Floyd to 17 months on each charge, running concurrently with each other but consecutively to the previous sentences.

## ANALYSIS

### THE RIGHT TO SELF-REPRESENTATION

¶14 Floyd contends that the trial court violated his right to represent himself. Because the court's determination that he intentionally disrupted the proceedings was not manifestly unreasonable and rests on a sufficient factual basis in the record, we disagree.

¶15 Washington's constitution explicitly guarantees criminal defendants the right to self-representation. *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010) (citing WASH. CONST. art. I, § 22 ("the accused shall have the right to appear and defend in person")). The United States Supreme Court has also held that the Sixth Amendment to the United States Constitution implicitly guarantees this right. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Courts regard this right as "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *Madsen*, 168 Wn.2d at 503 (citing *State v. Vermillion*, 112 Wn. App. 844, 51 P.3d 188 (2002)). Improper denial of the right to proceed pro se requires reversal, whether or not prejudice results. *Vermillion*, 112 Wn. App. at 851.

¶16 We review a trial court's denial of the right to defend in person for abuse of discretion. *State v. Hemenway*, 122 Wn. App. 787, 792, 95 P.3d 408 (2004). A trial court abuses its discretion if its "decision is manifestly unreasonable or 'rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Madsen*, 168 Wn.2d at 504 (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

¶17 A trial court may terminate pro se status if a defendant "deliberately engages in serious and obstructionist misconduct,"[4] *Faretta*, 422 U.S. at 834 n.46, that is, "if a defendant is sufficiently disruptive or if delay becomes the chief motive." *Madsen*, 168 Wn.2d at 509 n.4. That a defendant is "obnoxious" and "unfamiliar with legal rules," however, does not justify a trial court's denial of the right to proceed pro se. *Madsen*, 168 Wn.2d at 509. A court may impose lesser sanctions for failure to adhere to proper procedures but "must not sacrifice constitutional rights on the altar of efficiency." *Madsen*, 168 Wn.2d at 509.

¶18 Here, the trial court explicitly based its decision on its finding that Floyd was intentionally disrupting the trial:

> THE COURT: Well, I am considering—I gave Mr. Floyd the floor 17 minutes ago at 2:22. He has taken 17 minutes now in closing argument, and I would say all but one minute of it has been an effort to argue facts not in evidence, or to make inappropriate statements that are, I think, disruptive. It's become pretty clear to me that he is undertaking to, as I said, scuttle this trial.
>
> MR. FLOYD: No, sir.
>
> THE COURT: He is disruptive. And what is most important is he has consistently showed an inability to follow or respect the Court's directions. The Court has directed him to argue the facts in evidence. He has gone beyond the facts. He is arguing what—holding up investigative reports. He wants to testify anew as to what the pictures show, which he can't do. And I think he is intentionally doing that to disrupt this proceeding.

---

[4] The case cited by the *Faretta* Court in its discussion of conduct that would justify denial of the right to self-representation, *Illinois v. Allen*, involved the defendant's right to be present at trial. 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). In that context, a court may only order a defendant removed from the courtroom who "engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." *Allen*, 397 U.S. at 338. While the record before us does not establish that Floyd's conduct exceeded that limit, we do not take the *Faretta* Court's citation to *Allen* to mean that the degree of disruption required to justify revocation of a defendant's pro se status under the United States Constitution is as extreme as that required to justify removing a defendant from the courtroom.

VRP (Apr. 5-6, 2011) at 743. These remarks show that the trial court applied the correct legal standard, as articulated by our Supreme Court in *Madsen*.

¶19 The next inquiry under *Madsen* is whether the trial court's action rested on a sufficient factual basis in the record. Because the trial court has the opportunity to observe a defendant's demeanor and nonverbal conduct, appellate courts owe considerable deference to a trial court's finding in this regard. *See State v. Read*, 163 Wn. App. 853, 864, 261 P.3d 207 (2011) (noting that even an "independent constitutionally based review requires us to give due regard 'to the trial judge's opportunity to observe the demeanor of the witnesses' and the trial court's deter-mination as to credibility" (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-500, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984))).

¶20 As described above, the record shows repeated disruptions by Floyd and repeated admonitions by the court, as well as considerable time spent by the court hearing motions brought by Floyd that the court ultimately found duplicative or meritless. The record shows that much of Floyd's closing argument was devoted to attempting to argue facts not in evidence, including testifying anew as to what pictures in an investigative report showed.

¶21 On the other hand, the force of these complications is diluted by the timing of the court's action: the trial had proceeded nearly to its conclusion, thus reducing the time that would be wasted by further problems. Nonetheless, the record is clear that the obstacles from Floyd's actions were continuing unabated into closing argument. Taken as a whole, the record contains sufficient evidence to support the trial court's finding that Floyd intentionally disrupted the proceedings. Under the circumstances presented, we are unwilling to second-guess the trial court's determination.

¶22 Finally, whether the trial court's decision was mani-festly unreasonable presents a closer question for two

reasons. First, during the discussion leading up to the court's termination of his pro se status, Floyd asked for one more chance and promised to consult closely with standby counsel to avoid further disruption. The court, however, did not give Floyd the opportunity to follow through on this promise. We are troubled that the trial court did not attempt this measure as a last resort, since it is the sort of less severe course of action discussed in *Madsen*, 168 Wn.2d at 509 n.4. However, the numerous delays and disruptions continuing well into closing argument supply a plausible basis for terminating pro se status without trying this last alternative. Although it would have been better practice to attempt this measure, declining the invitation was not manifestly unreasonable.

¶23 Second, prior to the revocation of Floyd's pro se status, standby counsel informed the court that he would make the closing argument he deemed best supported by the law and the facts, even though Floyd desired to make a different argument.[5] In establishing the right to represent oneself, *Faretta*, 422 U.S. at 819-21, made clear that the right to control one's defense, although subject to limitations, supports the implication of the right to represent oneself from the Sixth Amendment.[6] If the control of one's defense plays a role in the recognition of the right to pro se representation, it should also play a role in determining whether revocation of that right is an abuse of discretion. Therefore, the court's knowledge that revocation of pro se status would force an unwanted defense on Floyd must be

---

[5] Floyd sought to defend by asserting that the victim had harmed herself. When his pro se status was terminated, his counsel argued that he was at most guilty only of third degree assault because the victim did not suffer substantial bodily harm.

[6] Although not involving pro se representation, the recent decision in *State v. Coristine*, 177 Wn.2d 370, 300 P.3d 400 (2013), is in harmony with *Faretta*, holding that the Sixth Amendment requires the court to honor a defendant's voluntary and intelligent choice to forgo an affirmative defense and that instructing the jury on an affirmative defense over the defendant's objection is unconstitutional. *Coristine*, however, does not analyze whether the revocation of pro se status is flawed if it leads to the presentation of an unwanted defense.

considered in deciding whether that revocation was an abuse of discretion.

¶24 Under *Faretta* and *Coristine*, forcing an unwanted defense on a criminal defendant may in many cases slip into a violation of the Sixth Amendment. *Faretta*, 422 U.S. at 819-21; *State v. Coristine*, 177 Wn.2d 370, 376-77, 300 P.3d 400 (2013). Here, however, the trial court revoked pro se status only after unabated missteps sufficient to support the finding that the defendant was intentionally disrupting the proceedings. In that posture, revocation does not become manifestly unreasonable because it results in an unwanted defense that, in counsel's opinion, will better serve the defendant's case. *See State v. Bergstrom*, 162 Wn.2d 87, 95, 169 P.3d 816 (2007).

¶25 The trial court did not abuse its discretion in terminating Floyd's pro se status based on the determination that he intentionally disrupted the proceedings. We therefore affirm his convictions.

¶26 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

HUNT and PENOYAR, JJ., concur.

Review denied at 180 Wn.2d 1005 (2014).