IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34171-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COREY JAVON WILLIAMS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Corey Javon Williams—aka Corey Javon Pugh, Sr., who asked

to be addressed as Corey Pugh, Sr. in the trial below[1]—appeals, making eight

assignments of error to his residential burglary and second degree theft convictions and

his sentence. We find no error or abuse of discretion by the trial court and affirm.

FACTS AND PROCEDURAL BACKGROUND

In 2013, Kennewick police detective Rich Runge investigated a series of

unauthorized "rentals" of homes by Corey Javon Williams. Mr. Williams had identified

---

[1] We will refer to the defendant as Corey Javon Williams, notwithstanding that the trial court honored his request to be referred to during trial as Corey Pugh.
    The State offered evidence at trial that the defendant uses both names. He was charged and convicted as Corey Javon Williams, which is how he is identified on the FBI's Interstate Identification Index and on the Washington Judicial Information System's defendant case history.

homes that were unoccupied for a period of time, rekeyed them, falsely represented to prospective tenants that he owned them, and then rented them out. Mr. Williams ultimately pleaded guilty to criminal trespass, four counts of second degree theft, attempted second degree theft, and third degree theft.

Following his release from prison, in September 2015, Mr. Williams, acting as a principal for his limited liability company, C. Williams Group, LLC, filed liens against two other unoccupied Kennewick residential properties and sought to rent them out. One was located at 523 North Ely Street, with title held by Joseph and Gail Timmins. The other was at 2402 West Bruneau Avenue, with title held by Catlino and Barbara Leija.

Detective Runge determined that Mr. and Mrs. Leija had been dead since at least 2013. He determined that the North Ely Street residence was being occupied by Krista Ironbear pursuant to a rental agreement offered her by the C. Williams Group, LLC in September 2015. An $800 deposit and $1,000 for the first month's rent had been paid to Mr. Williams at that time by Ms. Ironbear's mother, Laura Gillette.

The State initially charged Mr. Williams with two counts of residential burglary for his unauthorized activities at the two residences. The affidavit of probable cause filed in support of the motion for an arrest warrant stated that in a conversation with Detective Runge, Mr. Williams claimed to own the two properties by virtue of the liens he had filed against them. It stated that Mr. Williams had rented the North Ely property to Ms.

2

Ironbear in September 2015 and attempted to rent the Leija property to two men who

paid him a deposit but then became suspicious and backed out.

When arraigned, Mr. Williams told the court he wished to proceed pro se.  A

*Faretta*[2] inquiry followed:

> THE COURT:  Do you wish to be represented by an attorney in these matters?
> MR. WILLIAMS:  No, I do not.
> THE COURT:  You wish to represent yourself?
> MR. WILLIAMS:  Yes.
> . . . .
> THE COURT:  Well, what we will do now is go through the colloquy regarding self-representation. . . .
> . . . .
> THE COURT:  Sir, you understand if you represent yourself you will be held to the same standards as an attorney?
> MR. WILLIAMS:  Absolutely.
> THE COURT:  You understand you will be held to the same standard as to your knowledge of the law and court rules and the presentation of evidence?
> MR. WILLIAMS:  Yes, sir.
> THE COURT:  All right.  Sir, what is the highest grade you completed in school?
> MR. WILLIAMS:  I have three years of college.
> THE COURT:  Are you familiar with the rules of evidence in the State of Washington.
> MR. WILLIAMS:  Yes, I am.
> THE COURT:  Can you tell me how you are familiar with them?
> MR. WILLIAMS:  I studied criminal law and business law at Columbia Basin College.
> THE COURT:  Are you familiar with the Revised Code of Washington?  In particular the Revised Code of Washington as it relates to the this [sic] charge?

---

[2] *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

MR. WILLIAMS:  Yes, I am.

THE COURT:  Can you tell me how you are familiar with that?

MR. WILLIAMS:  I believe that I've had prior 7.8 motions with this prior RCW with another Alaska statute which I fought in the Supreme Court.

THE COURT:  Supreme Court of which state, sir?

MR. WILLIAMS:  Washington.

THE COURT:  And when you say 7.8, you are referring to the Washington Criminal Rule 7.8?

MR. WILLIAMS:  Yes, sir.

. . . .

THE COURT:  Given that information, you also understand that residential burglary is a class B felony as well?

MR. WILLIAMS:  I do.

THE COURT:  So again subject to the same potential maximum of 10 years or a fine not to exceed $20,000.  You are aware of that?

MR. WILLIAMS:  Yes, sir.

THE COURT:  Without agreeing that your criminal history is calculation is [sic] correct you heard [the prosecutor's] recitation of what the guideline range is believed to be in the State of Washington?

MR. WILLIAMS:  Let the record reflect that I object.

THE COURT:  With that in mind, is it your desire to represent yourself?

MR. WILLIAMS:  Absolutely.  As a secured party, I am.

. . . .

THE COURT:  At this time I'm satisfied you are aware of the nature of the charge—and just to perfect the record again here, sir.  You indicated you were aware of the statute with respect to theft of a motor vehicle.  Are you also familiar with the Revised Code of Washington and the elements as they relate to residential burglary?

MR. WILLIAMS:  As a secured party, sir, I am aware and I do object to that.

THE COURT:  Sir, I will have to ask you what you mean by the term secured party?

MR. WILLIAMS:  I'm secured party in the State of Washington.  My organization is secured party C. Williams LLC.  I've been brought before this Court in that the Court is aware of my secured party status.  Nothing further.

4

THE COURT:  All right.  With that said, at this time I'm going to find that you are aware of the nature of the charge.  You are aware you will be held to the same standard as would an attorney before the Court.  And I will allow you to represent yourself, sir.  You understand at any time should you wish to be represented by an attorney you may make such request to the Court and you will be entitled to representation even if the Court determines that you do not have the funds to retain an attorney the court would have the authority to appoint an attorney for you at no cost to you upon your request.  You understand that?
MR. WILLIAMS:  Yes.

Report of Proceedings (RP) (Dec. 28, 2015) at 3-9.

At a hearing on motions that took place over two weeks before trial, the court

cautioned Mr. Williams further, stating:

Mr. Williams, you will recall when I—when we went through a colloquy and I allowed you to represent yourself, I indicated to you that you would be held to the same standard as an attorney.  You would be held to the same standard of knowledge of the law and the same standard with respect to preparation, presentation, and the conduct of the case.  I also told you that I could not help you. . . .  I urge you to be represented by an attorney.
You have the right to representation by an attorney, even if you cannot afford one.  And I will appoint an attorney for you at any time during these cases, if you request one.

RP (Jan. 28, 2016) at 12-13.

At the next hearing, which took place on February 11, 2016, the court cautioned

Mr. Williams again, after Mr. Williams argued that the State had no "complaining

witness."  It told Mr. Williams, "I would respectfully submit to you one of the dangers of

representing yourself, which is that you can take a legal term of art and turn it into what

may seem like a defense, when it may not in fact be a defense.  I don't believe that the

word 'complaining witness', at least from listening to you, has the meaning you believe it does."  RP (Feb. 11, 2016) at 9.

On the Thursday before the Tuesday, February 16, 2016 trial date, the State amended the information, adding a charge of second degree theft for the $1,800 that Mr. Williams had obtained from Ms. Gillette.

In motions in limine filed by the State the Friday before trial, it sought a ruling that it could offer evidence of Mr. Williams's conviction of four similar crimes in Benton County to which he pleaded guilty the year before.  It contended that the prior convictions were admissible under ER 404(b) as evidence of a common scheme or plan and of his intent to deceive the victims.

When motions in limine were argued the morning of trial, the prosecutor characterized Mr. Williams's conduct in the 2013 crimes as

> basically rent[ing] out property that was foreclosed on or had been abandoned.  In those cases the evidence was that he either claimed some sort of ownership interest in those other properties through a doctrine of adverse possession or he would go to a foreclosed owner, the former owner who had filed bankruptcy or been foreclosed on and would get a quitclaim deed and claim he has some sort of possessory interest in the property. . . . [H]e pled guilty, was sentenced to [I] think 17 months.
> So he gets out of prison and in this case our allegation is that what he did again was rented out property that had been abandoned.

RP (Feb. 16, 2016) at 5.  Given the opportunity to respond to the State's interest in offering the convictions, Mr. Williams's only objection was that "my name is Corey

6

Javon Pugh," and "I don't feel that the State should be able to bring in any type of this evidence because the State has not produced [sic] that I am Corey J. Williams." *Id*. at 6. Having heard that objection, the court said, "I'm going to allow those convictions in." *Id.*

After dealing with the motions in limine, the trial court asked Mr. Williams to confirm that his defense was a general denial. Mr. Williams responded that he was also asserting abandonment, saying, "I believe it applied to the residential burglary in consensus with criminal trespassing." *Id.* at 10.

Among the State's witnesses was Ms. Timmins, the legal owner of the North Ely residence. Ms. Timmins testified that she lived in the house from 1983 until 2013, when she moved out after her husband passed away and she could no longer afford the mortgage payments. She had received collection notices and assumed the bank would foreclose on the house. She testified that she never hired anyone to do repair work or improvements at her house, contrary to the C. Williams Group's lien claiming it was owed $11,500 for property maintenance and repair. She testified that she did not owe Mr. Williams any money and did not give anyone permission to be inside the home after she left.

Ms. Gillette was called by the State and testified to meeting Mr. Williams, his representations about owning the property, and the payments she had made to him. Ms. Ironbear was also called by the State and testified to entering into the rental agreement

with Mr. Williams. She testified that very shortly after she moved in, a detective came to the house to speak with her about the fact that Mr. Williams did not own the house. She admitted living at the house for approximately four months before moving out, without paying rent "[b]ecause I had no idea how to get a hold of whoever leased it to me." RP (Feb. 16, 2016) at 75.

Detective Runge testified to the fruits of his investigation and that it was October 5, 2015, when he spoke with Ms. Ironbear and told her that Mr. Williams did not own the North Ely residence.

At the close of evidence, the trial court and the parties discussed jury instructions. Although Mr. Williams had not proposed an instruction on abandonment, he asked "if [the court] would instruct under abandonment." RP (Feb. 16, 2016) at 133. The court refused.

The jury found Mr. Williams guilty of residential burglary of the North Ely residence and second degree theft, but acquitted him of the charge of residential burglary of the West Bruneau residence. The trial court sentenced Mr. Williams to an exceptional consecutive sentence of 106 months' total confinement, with 84 months for the residential burglary and 22 months for the second degree theft. It imposed mandatory and some discretionary legal financial obligations after stating that Mr. Williams "is able, capable of working." RP (Jan. 28, 2016) at 25.

Mr. Williams appeals.

ANALYSIS

*Sufficiency of evidence of theft*

Citing *State v. Lee*, 128 Wn.2d 151, 904 P.2d 1143 (1995), which he characterizes as involving facts "nearly identical" to this case, Mr. Williams argues that where theft is charged, loss to a victim is required for the essential element of an "unlawful deprivation"—and "[w]hen the 'victim' receives what she bargains for, no theft is committed." Br. of Appellant at 14, 13 (quoting *Lee*, 128 Wn.2d at 162). Because Ms. Gillette's daughter received the benefit of a rental accommodation for four months in exchange for payment of less than two months' rent, Mr. Williams contends that the evidence was insufficient to support the jury's verdict finding him guilty of second degree theft.

A person is guilty of second degree theft if he commits theft of property or services with a value exceeding $750 but less than $5,000. RCW 9A.56.040(1)(a). In the trial below, the State presented no evidence that Ms. Gillette sustained a net loss after taking into consideration the value of her daughter's four months' housing, let alone a net loss exceeding $750, so this issue does not turn on the usual tests for reviewing the sufficiency of evidence. It turns, instead, on whether Mr. Williams is right about the law.

Under RCW 9A.56.020(1)(b), providing for what is known as theft by deception, "'Theft' means . . . [b]y color or aid of deception *to obtain control over the property or services of another or the value thereof*, with intent to deprive him or her of such

9

property or services." (Emphasis added.) "In deception cases, the statute looks only to the value of the property obtained, not the net result of the exchange." *State v. George*, 161 Wn.2d 203, 209, 164 P.3d 506 (2007).

In *George*, a father and son placed an advertisement for the sale of a pickup truck that fraudulently misrepresented the mileage, condition, and history of a truck they purchased for $1,800. *Id.* at 206. An undercover police officer handed the pair a cashier's check for the asking price of $5,500 and then arrested both. *Id.* The State charged them with first degree theft by deception and both were found guilty and convicted. *Id.* at 206-07. In affirming the Court of Appeals, which had affirmed the conviction, the Supreme Court discussed the singular importance of the value of the property or services the thief obtains from the victim:

> For purposes of a criminal charge, *there is no difference between a thief who, through deception or fraud, hands over something in exchange for the victim's property and a thief who surrenders nothing.* The legislature could have defined value in the context of a sale as the difference between what was obtained and what was given up, but it has not.

*Id.* at 213 (emphasis added); *see also State v. Farnworth*, 199 Wn. App. 185, 208, 398 P.3d 1172 (2017) ("[T]he value of property, for purposes of the theft statute, is the total value of the property relinquished by the victim regardless of whether the victim received some offsetting value in exchange.").

The decision in *Lee* on which Mr. Williams relies is, nonetheless, analogous to the facts of his case in many respects. In *Lee*, the defendant agreed to purchase a residence.

Before the closing date, he performed extensive repairs and improvements and then signed an agreement with the Red Cross making the residence immediately available as emergency housing for a 30-day period. *Lee*, 128 Wn.2d at 153-54. This was without any agreement by the owner of the property that Mr. Lee could have early possession of the residence to perform improvements or for any other purpose. *Id.* The owner of the residence learned of the situation and objected, but after Mr. Lee failed to attend the closing, the owner sold the residence to the emergency tenants. *Id.* at 154. Mr. Lee's conviction of second degree theft was reversed by the Washington Supreme Court, which held that the State had failed to present sufficient evidence that any victim had actually lost $250[3] or more. *Id.* at 163-64.

We might struggle with distinguishing *Lee* if the Supreme Court had not sharply limited its application itself, in *George*. It described *Lee* as "an unusual case" in which the relevant parties each received "exactly" what they were expecting or had contracted for. *George*, 161 Wn.2d at 212-13. The Supreme Court clarified that in *Lee*, it "did not, and had no occasion to, reach whether an offset was appropriate." *Id.*

Ms. Ironbear and Ms. Gillette did not receive "exactly" what Ms. Ironbear had contracted for. Rather than Ms. Ironbear having a secure, lawful residence, she and her

---

[3] At the time *Lee* was decided, RCW 9A.56.040 defined second degree theft as theft of property or services which exceeds $250 in value. *See* S.B. 6167, 60th Leg., Reg. Sess. (Wash. 2009).

11

mother learned within a matter of weeks that Ms. Ironbear's "landlord" was a trespasser. Ms. Ironbear moved out several months later. Since it is the $1,800 that Mr. Williams obtained through deception that is the relevant "value" for purposes of the charge of second degree theft, the State's evidence was sufficient.

### *The trial court's* Faretta *colloquy was adequate*

Mr. Williams next contends that the trial court's *Faretta* colloquy was inadequate.

A defendant who has been found competent to stand trial may ask to represent himself or herself. *See In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 667, 260 P.3d 874 (2011). Self-representation is a constitutional right, implicit in the Sixth Amendment right to counsel and explicitly guaranteed by article I, section 22 of the Washington Constitution. *Faretta*, 422 U.S. at 818-32; *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010).

A waiver of the defendant's right to counsel "must be not only voluntary, but knowing and intelligent," however. *Rhome*, 172 Wn.2d at 667. A thorough colloquy on the record about the dangers and disadvantages of self-representation is the preferred method of ensuring an intelligent waiver of the right to counsel. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957 (1984).

"A waiver determination is an ad hoc determination that rests on a judge's evaluation of a defendant's conduct, background, and experience." *Rhome*, 172 Wn.2d at 667-68. We review such a decision for an abuse of discretion, reversing only when the

12

decision was manifestly unreasonable, reached by applying the wrong legal standard, or based on facts not supported by the record. *Id.* at 668. "Because the trial court has the opportunity to observe a defendant's demeanor and nonverbal conduct, appellate courts owe considerable deference to a trial court's finding in this regard." *State v. Floyd*, 178 Wn. App. 402, 410, 316 P.3d 1091 (2013).

The trial court's discussions of self-representation with Mr. Williams were extensive, but he asserts two shortcomings. The first is that the trial court "failed to inform [him] that technical rules exist which would bind him in the presentation of his case and failed to assure that [he] understood the risks of self-representation." Br. of Appellant at 1. The second is that the trial court "failed to inform [him] of the maximum penalties he faced upon conviction or of the nature and classification of theft in the second degree." *Id.*

Our Supreme Court's decision in *Acrey* is frequently cited for its statement that a court's colloquy with a defendant "at a minimum, should consist of informing the defendant of the nature and classification of the charge, the maximum penalty upon conviction and that technical rules exist which will bind defendant in the presentation of his case." 103 Wn.2d at 211. Yet the "minimum" it identifies is in the context of holding that a colloquy is "the *preferred means* of assuring that defendants understand the risks of self-representation" and conveying the court's "strong[ ] *recommend*[*ation*]" of a colloquy as the "*most efficient means* of limiting appeals." *Id.* (emphasis added). Absent

13

a colloquy, *Acrey* holds that the court will still "look at any evidence on the record that show defendant's actual awareness of the risks." *Id.*

Before allowing Mr. Williams to represent himself below, the trial court asked if Mr. Williams was familiar with the rules of evidence and the Revised Code of Washington, and he answered that he was. He was told he would be held to the same standards as an attorney, which Mr. Williams said he "absolutely" understood. RP (Dec. 28, 2015) at 5. Mr. Williams claimed to have taken college courses in criminal law and business law.

At the time Mr. Williams sought to represent himself, the trial court informed him that residential burglary, the only crime with which he was charged at the time, is a class B felony, subject to a maximum of 10 years' incarceration and a fine not to exceed $20,000. RP (Dec. 28, 2015) at 7. It is true that the trial court did not repeat the *Faretta* colloquy almost seven weeks later, when the State moved to amend the information to add the second degree theft charge, so Mr. Williams was not apprised of the maximum penalty upon conviction for that charge. But a second colloquy was not required. *See State v. Modica*, 136 Wn. App. 434, 445-46, 149 P.3d 446 (2006), *aff'd*, 164 Wn.2d 83, 186 P.3d 1062 (2008) ("The trial court was not required to sua sponte engage Modica in a second full colloquy in which it informed him of the new charge's maximum penalty."). Mr. Williams had already waived his right to counsel and had been representing himself at the time the State amended the charges. "[A] valid waiver of the right to assistance of

14

counsel generally continues throughout the criminal proceedings, unless the circumstances suggest that the waiver was limited." *Id.* at 445 (citing *Arnold v. United States*, 414 F.2d 1056, 1059 (9th Cir. 1969)).

In addition, the record reveals that Mr. Williams pleaded guilty only a year earlier to four counts of second degree theft committed in 2013, providing evidence that even without a further colloquy, he had an appreciation for the risk presented by the single second degree theft charge added by amendment.

Considering the extent of the colloquy and giving the appropriate deference to the trial court's finding, we find no abuse of discretion by the trial court in allowing Mr. Williams to represent himself.

*The trial court did not abuse its discretion in refusing to
instruct the jury on abandonment*

Mr. Williams argues that the trial court's refusal to instruct the jury on abandonment prevented him from arguing his theory of defense to the residential burglary charges. We review a trial court's refusal to give a requested jury instruction de novo when the refusal is based on a ruling of law. *State v. White*, 137 Wn. App. 227, 230, 152 P.3d 364 (2007).

Under RCW 9A.52.090, it is a defense to *criminal trespass in the first degree* that a building involved was abandoned. RCW 9A.52.090(1), .070. The legislature has not identified abandonment as a defense to residential burglary. This court has repeatedly

held that the jury need not be instructed on abandonment as a defense to residential burglary. *State v. Olson*, 182 Wn. App. 362, 377, 329 P.3d 121 (2014); *State v. Jensen*, 149 Wn. App. 393, 399-400, 203 P.3d 393 (2009); *State v. Ponce*, 166 Wn. App. 409, 269 P.3d 408 (2012).

Mr. Williams nonetheless argues that this court's opinion in *State v. J.P.*, 130 Wn. App. 887, 895, 125 P.3d 215 (2005) supports his right to have the jury instructed on abandonment as a defense to residential burglary. For reasons explained in *Ponce* and *State v. Cordero*, 170 Wn. App. 351, 284 P.3d 773 (2012), Mr. Williams reads too much into *J.P.* In that case, the court recognized the holding of *City of Bremerton v. Widell*, 146 Wn.2d 561, 570, 51 P.3d 733 (2002) that statutory defenses to criminal trespass that negate the element of unlawfully entering or remaining at premises are not affirmative defenses. Instead, "once a defendant has offered some evidence that his or her entry was permissible . . . the State bears the burden to prove beyond a reasonable doubt that the defendant lacked license to enter." *Id.*

The trial court's instructions were sufficient for Mr. Williams to argue any defense that would negate the element of unlawfully entering or remaining in the Kennewick residences. In the to-convict instruction for residential burglary regarding 523 N. Ely, the trial court instructed the jury that to convict Mr. Williams the State must prove the following elements beyond a reasonable doubt:

16

(1) That on or about the time from September 15, 2015 to October 5, 2015, *the defendant entered or remained unlawfully in a dwelling*;
(2) That the entering or remaining was with intent to commit a crime against a person or property therein; and
(3) That this act occurred in the State of Washington.

Clerk's Papers (CP) at 59 (emphasis added). Jury instruction 10 further instructed the jury that "A person enters or remains unlawfully in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." *Id.* at 61. There was no error.

*The trial court did not err in admitting Mr. Williams's prior convictions*

Mr. Williams next argues the trial court erred when it admitted evidence of his prior convictions without articulating the purpose of their admission and conducting the balancing required by ER 404(b).

ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show conformity therewith. *See State v. Fisher*, 165 Wn.2d 727, 744, 202 P.3d 937 (2009). Alongside this general prohibition, ER 404(b) provides examples of proper purposes for which such evidence may be admissible, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

The analytical approach used to determine the admissibility of a person's prior crimes, wrongs, or acts under ER 404(b) is well settled. The trial court must "'(1) find

by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).  The party seeking to introduce the evidence has the burden of establishing the first three elements. *Gresham*, 173 Wn.2d at 421.

The trial court is supposed to conduct its analysis on the record.  *State v. Sublett*, 156 Wn. App. 160, 195, 231 P.3d 231 (2010).  "But where the trial court fails to conduct an ER 404(b) analysis on the record, the error is harmless unless the failure to do the balancing, within reasonable probability, materially affected the outcome of the trial." *Id.* at 196.

Here, the first order of business on the morning trial began was argument of the parties' motions in limine.  One of the first addressed by the State was its desire to offer evidence of Mr. Williams's four prior second degree theft convictions for rekeying and renting other peoples' unoccupied homes.  It argued the prior convictions involved the same scheme and plan as the current offense conduct, and "go[ ] to his knowledge he was doing something illegal and his intent to deceive the victims."  RP (Feb. 16, 2016) at 5.

Asked to respond, Mr. Williams did not disagree with the prosecutor's description of the offense conduct involved in the four crimes; he objected solely on the basis that

18

"Corey J. Williams" was convicted of the crimes, not Corey J. Pugh. Without conducting the balancing analysis on the record, the trial court stated it would allow the evidence. Mr. Williams made no further objection.

The trial court erred by failing to conduct the balancing analysis on the record, but the error was harmless. At issue were convictions, so there was no question the conduct occurred. The State articulated permitted purposes for which the evidence would be offered. There was substantial similarity between Mr. Williams's prior criminal acts and the acts for which he was being charged. There is no reasonable probability that the trial court's failure to weigh probative value against prejudice on the record materially affected the outcome of the trial.

*The trial court did not exceed its sentencing authority by*
*ordering restitution*

Mr. Williams next contends the trial court exceeded its authority by ordering him to pay $1,800 restitution to Ms. Gillette, arguing that her deposit and rent payment did not go to waste. Mr. Williams's only objection to the restitution at the time of sentencing was that he was a "secured party" on the Ely Street property. RP (Jan. 28, 2016;) at 26.

Under RCW 9.94A.753(5), restitution "shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property," unless extraordinary circumstances make restitution inappropriate. RCW 9.94A.753(5) requires a sufficient causal connection between the crime with which an

19

offender is charged and convicted, and the injuries for which restitution is sought. We review a trial court's award of restitution for abuse of discretion. *State v. Davison*, 116 Wn.2d 917, 919, 809 P.2d 1374 (1991).

When Ms. Gillette paid Mr. Williams $1,800 she did not receive, in exchange, the secure and lawful housing for her daughter that she bargained for. Instead, she paid $1,800 to someone the jury found to be a residential burglar. The trial court did not abuse its discretion.

### *We accede to the State's request that we strike the $357.56 in discretionary legal financial obligations (LFOs) rather than address Mr. Williams's* Blazina[4] *challenge*

Mr. Williams next argues that the trial court failed to make an individualized inquiry into his present and future ability to pay before it imposed discretionary LFOs.

The State agrees to strike the three fees that it concedes are discretionary: the sheriff's service fee, jury demand fee, and witness fee, which total $357.56. We accede to its request and will remand with directions to strike these discretionary LFOs.

### *Mr. Williams's argument that the criminal filing fee is discretionary has been rejected*

Finally, Mr. Williams argues that the trial court erred when it imposed the criminal filing fee, which he contends is discretionary, without conducting a *Blazina* inquiry. The criminal filing fee is mandatory. *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755

---

[4] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

20

No. 34171-2-III
*State v. Williams*

(2013); *State v. Stoddard*, 192 Wn. App. 222, 225, 366 P.3d 474 (2016); *State v. Gonzales*, 198 Wn. App. 151, 153, 392 P.3d 1158, *review denied*, 188 Wn.2d 1022, 398 P.3d 1140 (2017).

We remand with directions to strike the three discretionary LFOs but otherwise affirm the judgment and sentence.[5]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, A.C.J.

_____
Fearing, J

---

[5] Mr. Williams makes an assignment of error to cumulative error, which, having found no error, we need not address.

21